UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GLENN P. BOWMAN,                    )
                                   )
                Plaintiff,          )
                                   )
v.                                 )        No.:  3:04-CV-114
                                   )              (VARLAN/SHIRLEY)
PHP COMPANIES, INC., d/b/a          )
CARITEN HEALTHCARE,                 )
                                   )
                Defendant.          )


## MEMORANDUM OPINION

Plaintiff Glenn Bowman was a Regional Account Executive for defendant PHP

Companies d/b/a Cariten Healthcare from August 1997 until his termination on March 11,

2003.  Bowman has asserted claims against PHP for breach of contract, breach of the duty

of good faith and fair dealing, statutory and common law retaliatory discharge, failure to pay

sales commissions in violation of state law, promissory estoppel, conversion, and breach of

the Restatement (Second) of Agency.

PHP has filed two motions for partial summary judgment [Docs. 52, 58] which are

now ripe for determination.  The Court has carefully considered the pending motions and

related pleadings [Docs. 53, 59, 67, 137, 148, 155] along with the arguments of counsel

presented on September 22, 2005.  For the reasons set forth herein, the defendant's motions

will be granted in part and denied in part as follows: summary judgment will be granted as

to plaintiff's statutory and common claims of retaliatory discharge, failure to pay sales

commissions in violation of Tenn. Code Ann. § 47-50-114, breach of the duty of good faith

and fair dealing, and conversion; summary judgment will be denied with respect to plaintiff's

claims of breach of contract and promissory estoppel.[1]


## I.      Relevant Facts

Bowman was employed by PHP as a Regional Account Executive in August 1997.

He worked out of PHP's Tri-Cities office in Johnson City, Tennessee, selling group health

insurance plans.  Upon his employment, Bowman signed a receipt and acknowledgment of

the Cariten Employee Handbook which provided:

> I am aware that during the course of my employment confidential information
> will be made available to me.  I understand that such critical information must
> not be disseminated or used outside PHP/Cariten's premises.  In the event of
> termination of employment, whether voluntary or involuntary, I hereby agree
> not to utilize or exploit this information with any other individual or company.

[Doc. 58, Dep. Ex. 3.]  Bowman signed a second receipt and acknowledgment for the

employee handbook in September 2001 which also contains the above-quoted language.

[*Id*., Dep. Ex. 2.]  Also, upon his employment in 1997, Bowman signed a confidentiality

agreement which states in part:

> I, therefore agree to respect and maintain the confidentiality of all discussions,
> deliberations, minutes, records, documents of any kind, and other information
> generated in connection with the function of PHP or related operations, and to

---

[1]As noted in plaintiff's response brief [Doc. 137 at p. 1], PHP did not move for
summary judgment on plaintiff's claim for violation of the Restatement (Second) of Agency
§§ 432, 436, 441, 443, 454 [Doc. 159 at ¶¶ 60-61].   While it is unclear whether the
Restatement provides an independent basis for relief, the merits of such a claim are not
presently before the Court.

> make no voluntary disclosure of any such information except to persons conducting the affairs of PHP.
>
> I understand that PHP is entitled to take such action as is deemed appropriate to insure that confidentiality is maintained, including action necessitated by any breach or threatened breach of this Agreement, including termination of employment.

[Doc. 58, Dep. Ex. 5.] The record also reveals that plaintiff agreed to comply with the American Association of Health Plans Code of Ethics and the Covenant Health Integrity-Compliance Guide. [*Id.*, Dep. Exs. 6, 7.]

Bowman was compensated on the basis of salary plus incentives or commissions. Bowman's incentive compensation was determined according to a written Incentive Compensation Plan ("ICP") promulgated by PHP each calendar year.

Bowman's ICPs for calendar years 2000, 2001, and 2002 contain the same following language:

> PHP/Cariten senior management reserves the right at its sole discretion to adjust, terminate, or make judgement decisions at any time in regard to the plan. This is not a contract.

[Doc. 137, Ex. 10 at p. 3; Doc. 52, Dep. Exs. 11, 12 at p. 3.] The 2003 ICP contains the following similar provision:

> Cariten senior management reserves the sole and exclusive right to adjust, modify, terminate or make judgement decisions at any time in regard to the Incentive Compensation Plan. This plan description is not a contract.

[Doc. 52, Dep. Ex. 13 at p. 3.] The 2003 ICP also states that "[t]he Incentive Compensation Plan (ICP) is not an employment contract and does not vest. Cariten employees are "at will"

as defined in state of Tennessee law." [*Id.* at p. 2.] The 2003 ICP further states "[t]he Incentive Compensation Plan (ICP) is not a guarantee of employment or a contract." [*Id.*]

The 2000, 2001, and 2002 ICPs contain the following non-competition provision:

> Beginning with the effective date of your termination, you agree that you will not contact, market, solicit, or perform any other sales/service related activity with any PHP/Cariten existing accounts for up to 12 months.

[Doc. 137, Ex. 10 at p. 2; Doc. 52, Dep. Exs. 11 & 12 at p. 2.] The 2003 ICP contains a similar non-compete provision:

> Beginning with the effective date of termination, participants agree that they will not contact, market, solicit or perform any sales or service related activity with any Cariten existing accounts for 24 months.

[Doc. 52, Dep. Ex. 13 at p. 2.]

The 2000, 2001, and 2002 ICPs contain the following confidentiality provision:

> This plan is the property of PHP/Cariten and shall remain confidential and shall not be copied, duplicated, faxed, or discussed with anyone other than your manager or supervisor. Violation of this may result in your immediate termination of employment with cause.

[Doc. 137, Ex. 10 at p. 3; Doc. 52, Dep. Exs. 11 & 12 at p. 3.] The 2003 ICP confidentiality provision is as follows:

> This plan is the property of Cariten and shall remain confidential and shall not be copied, duplicated, faxed or discussed with anyone other than the Sales Manager, eligible employees, President or Human Resources. ... Violation of confidentiality may result in immediate termination of employment for cause.

[Doc. 52, Dep. Ex. 13 at p. 3.]

4

The ICPs generally provide two levels of incentive compensation for new business: an initial compensation factor and then a high achievement factor applied to new business above a certain threshold amount. For example, the 2001 ICP provides for a 1% incentive payment up to $2,750,000 and a 2 ½ % incentive payment for revenue above that amount. [Doc. 52, Dep. Ex. 11 at pp. 4-5.] Similarly, the 2002 ICP provides for 1% incentive payment up to $3,000,000 and a 2 ½ % incentive payment for revenue above that amount. [*Id.*, Dep. Ex. 12 at pp. 4-5.] The 2000, 2001, 2002, and 2003 ICPs all provide that incentive compensation "will be paid monthly based on revenue 'received.'" [Doc. 137, Ex. 10 at p. 5; Doc. 52, Dep. Exs. 11, 12 & 13 at p. 5.][2]

Bowman's breach of contract claim relates to his contention that PHP changed the way his incentive compensation was calculated in 2002. Prior to 2002, Greg Pierce, the Tri-Cities Division President and Bowman's supervisor, calculated Bowman's incentive compensation. In late 2001, PHP's Chief Financial Officer Jeffrey S. Collake made it known that he disagreed with the way Bowman's compensation was being calculated. Around October 2001, plaintiff prepared a scroll for Collake's benefit showing how his incentive compensation had previously been calculated. In early 2002, PHP changed the way it calculated Bowman's incentive compensation based on Collake's interpretation of the ICP.

---

[2]The 2003 ICP contains a staggered six-level formula for incentive compensation ranging from 1% up to 3.5% with a cap on plaintiff's total compensation of $200,000. [Doc. 52, Dep. Ex. 13 at pp. 3, 5.]

Beginning in early 2002, PHP based Bowman's incentive compensation calculation on the amount of revenue actually received, rather than based on the amount of sales made.

On March 6, 2003, Pierce informed PHP's Human Resources Director, Evelyn H. Maynard, that Bowman had disclosed confidential information to a broker. Specifically, Pierce advised that Bowman had told a broker, Jerry Harkelroad, that Cariten had agreed to give a health care provider, Mountain States Health Alliance, a twenty-three percent (23%) increase in reimbursements in a recent contract negotiation and therefore Cariten's premium rates were high and uncompetitive. Pierce further advised Maynard that Bowman had given the same information to another broker, Ken Lyons. Apparently, Lyons and Harkelroad discussed this information between themselves and Harkelroad then relayed the information to Mountain States' Chief Executive Officer Jim Hunter. Hunter then informed Pierce of Bowman's disclosures and Pierce relayed all of this information to Maynard in an e-mail [*see* Doc. 58, Dep. Ex. 55]. Pierce expressed his concerns to Maynard that Bowman's disclosure of this information could be relayed to PHP's main competitors, John Deere and Blue Cross/Blue Shield, and thus impede PHP's contract negotiations with Mountain States. It is worth noting that Bowman admits he disclosed this information to brokers, but he contends that the information is not confidential.

During the March 6 or 7, 2003 time frame, Lance Hunsinger, PHP's Chief Executive Officer, was informed of Bowman's disclosure of the terms of the Cariten-Mountain States contract negotiations and Hunsinger made the decision to terminate Bowman's employment.

On March 11, 2003, Pierce and Maynard met with Bowman and informed him that he was terminated for divulging confidential information.

Bowman asserts that he was terminated because on March 6, 2003, he told Pierce that PHP had "embezzled" from him by paying his incentive compensation based on Collake's calculation method rather than the previous method. On March 10, 2003, Bowman repeated this complaint to Pierce that PHP was "stealing" from him. Bowman also says that he told Pierce he wanted a lawyer to look at the ICP.

## II.     Analysis

### A.     Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that

is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

B.    Breach of Contract

PHP asserts several arguments in support of summary judgment on Bowman's breach of contract claims. First, PHP argues that none of the ICPs are contracts based on their plain language. PHP also argues that even if the ICPs are contracts, the plain terms of the ICPs cannot be modified by a course of performance or dealing. Further, PHP contends that it did not breach any contract because it retained the sole discretion to adjust or terminate the plan or make judgement decisions regarding the plan.

As noted above, Bowman's ICPs for calendar years 2000, 2001, and 2002 contain the same following language:

> PHP/Cariten senior management reserves the right at its sole discretion to adjust, terminate, or make judgement decisions at any time in regard to the plan. This is not a contract.

[Doc. 52, Dep. Exs. 11, 12 at p. 3.] The 2003 ICP contains the following provision:

8

> Cariten senior management reserves the sole and exclusive right to adjust, modify, terminate or make judgement decisions at any time in regard to the Incentive Compensation Plan. This plan description is not a contract.

[*Id.*, Dep. Ex. 13 at p. 3.] The 2003 ICP also states that "[t]he Incentive Compensation Plan (ICP) is not an employment contract and does not vest. Cariten employees are "at will" as defined in state of Tennessee law." [*Id.* at p. 2.] The 2003 further states "[t]he Incentive Compensation Plan (ICP) is not a guarantee of employment or a contract." [*Id.*] PHP argues that the plain language "this is not a contract" means exactly what it says.

Bowman argues that this language is not controlling because the ICPs contain an exchange of promises thus creating an enforceable bilateral contract. Specifically, Bowman contends that PHP promised through the ICPs to pay the employee according to the terms of the agreement in exchange for the employee's promise not to compete with PHP and not to disclose confidential information. Bowman argues that this exchange of promises demonstrates the parties' intent for the ICP to be an enforceable contract.

A contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Higgins v. Oil, Chem., & Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991). It is well settled Tennessee law that the cardinal rule in the construction of contracts is to ascertain the intent of the parties. *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310, 313 (Tenn. Ct. App. 1984). However, it is also well settled that if the contract is plain and unambiguous, the meaning thereof is a question of law and it is the Court's function to

interpret the contract as written according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355, 358 (Tenn. 1955). A contract need not be in writing to be enforceable and an enforceable contract may be oral or written or both. *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000). Although oral contracts are enforceable, the terms of the agreement must be proved by those seeking to enforce them. *CPB Management, Inc. v. Everly*, 939 S.W.2d 78, 82 (Tenn. Ct. App. 1996).

Whether the ICPs are contracts is a very close question. The phrase "this is not a contract" is clear and unambiguous. It is also clear that PHP has reserved the discretion in the ICPs to alter, amend, or terminate the provisions of the ICPs at any time.[3] However, with the exception of the phrase "this is not a contract," the ICPs have all the hallmarks of a contract. They evidence Bowman's agreement not to compete with PHP and his agreement not to disclose confidential information about the ICPs in exchange for PHP's agreement to pay incentive compensation according to the terms set forth in the ICPs. The 2001 and 2002 ICPs further contain the following acknowledgment signed by both Bowman and his supervisor, Greg Pierce:

> I have received and read the 2001 [2002] PHP/Cariten Incentive Compensation Program. I have received the plan and agree to abide by its terms and especially understand the confidentiality clause outlined in the plan and will adhere to this provision.

---

[3]It is worth noting that Bowman does not dispute that PHP reserved the right to alter his incentive compensation plan at any time and to pay him accordingly from that point going forward. The heart of Bowman's complaint appears to be his contention that PHP could not change the way he was compensated for sales previously made based on a new method of computing his incentive compensation.

10

[Doc. 52, Dep. Exs. 11, 12.] The 2003 ICP contains a virtually identical provision [*see id.*, Dep. Ex. 13]. This language clearly indicates an intent to bind Bowman to the terms of the ICPs. The Court can easily assume that, if Bowman had violated the non-compete provision of the ICP, PHP would not hesitate to attempt to enforce the terms of the ICP as evidence of the parties' agreement. Thus, the real question is whether the parties can enter into a contract with mutual promises which includes the provision that it is not a contract.

Not surprisingly, the Court has found a dearth of authority on such an unusual issue. Certainly, there are cases as cited in PHP's briefs which indicate that certain employee benefit plans and employee handbooks may not be held to be contracts when they contain express provisions disclaiming any contractual intent. However, such documents do not usually contain the employee's promise not to compete with the employer following termination or the promise not to disclose confidential information.

The Court concludes that it need not determine whether the ICPs themselves are contracts or not. Instead, it is evident that the parties had an enforceable employment compensation agreement whereby Bowman would perform sales work for PHP and PHP would compensate him according to the type and level of sales he made. The details of his compensation are manifested by the ICPs. Bowman's claim that PHP did not compensate him as agreed is a breach of contract claim, whether or not the pieces of paper representing the parties' agreement are contracts. An analogous situation would be if an attorney was hired by a law firm to practice law at a specific annual salary. If the attorney did practice law

11

for the firm and was not paid the salary promised, the attorney's claim would be a breach of contract claim even if the parties did not execute a written agreement.

Thus, the Court finds that Bowman has a valid breach of contract claim for PHP's alleged failure to pay him incentive compensation as agreed. The Court further finds that whether or not PHP actually compensated him in accordance with the parties' agreements is a question of fact for the jury. Accordingly, summary judgment will be denied on this claim.

C.     Breach of the Duty of Good Faith and Fair Dealing

Bowman asserts that PHP has breached its duty of good faith and fair dealing by failing and refusing to pay him in full for all commissions earned. [Doc. 159 at ¶ 55.] PHP argues that Bowman cannot state such a claim because the ICPs reserve the sole discretion to PHP to adjust, terminate, or make judgment decisions about the plan. Thus, PHP argues that Bowman cannot show that PHP deviated from the terms of the ICP. Bowman argues that it remains an issue for the jury to determine whether PHP breached the standards of good faith and fair dealing which are implied in every contract under Tennessee law.

It is undisputed that in Tennessee there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement. *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003); *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996). However, the breach of such duty is not an independent basis for relief; it is merely one way in which a breach of contract may be demonstrated. *Shah*, 338 F.3d at

572. Therefore, PHP's motion for summary judgment will be granted on this issue and Bowman's claim for breach of the duty of good faith and fair dealing will be dismissed.

D.    Retaliatory Discharge

PHP argues that Bowman cannot prove a prima facie case of either common law or statutory retaliatory discharge. In order to establish a prima facie case of common law retaliatory discharge, a plaintiff must prove the following elements:

> (1) that an employment-at-will relationship existed;
> (2) that the employee was discharged;
> (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and
> (4) that *a substantial factor* in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Crews v. Buckman Laboratories Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002) (emphasis added). In order to prevail on a statutory whistleblower claim, known as the Tennessee Public Protection Act, the employee must prove the same elements except that the employee must show that the failure to participate in or remain silent about an illegal activity was the *sole* reason, rather than a substantial factor, for the employee's termination. Tenn. Code Ann. § 50-1-304; *Henderson v. Corrections Corp. of Am.*, 918 F. Supp. 204, 209 (E.D. Tenn. 1996) ("an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee"). It is undisputed that Bowman was an employee-at-will and that he was terminated, thus satisfying the first and second elements of a prima facie case.

13

Bowman contends that he was terminated in retaliation for accusing PHP of "stealing" or "embezzling" from him and for threatening to consult with a lawyer. Bowman argues that he thus accused PHP of illegal activity and that his threat to seek legal counsel constitutes a refusal to remain silent about such illegal activity. Bowman further argues that the short period of time between his accusations of illegal activity on March 6 and 10, 2003, and his termination on March 11, 2003, creates an inference of retaliatory motive.

PHP argues that Bowman was fired solely for disclosing confidential information. PHP also argues that a disagreement regarding an employee's compensation does not rise to the level of an illegal activity and there is no evidence that Bowman ever reported or refused to remain silent about any alleged illegal activity.

The record reveals that Bowman clearly agreed, in multiple documents, to keep PHP/Cariten information confidential. Moreover, it appears undisputed that PHP considered the information regarding the Mountain States Health Alliance account to be confidential and proprietary information and that Bowman communicated that information to brokers.

The first issue is whether Bowman's accusation of "stealing" or "embezzlement" rises to the level of accusing PHP of illegal activity and/or whether the threat to consult a lawyer rises to the level of refusing to remain silent about a perceived illegal activity. As PHP points out, Bowman has cited no authority for either proposition. PHP relies on *Robins v. Flagship Airlines, Inc.*, 956 S.W.2d 4 (Tenn. Ct. App. 1997), where an employee asserted a retaliatory discharge claim when he was terminated after sending two letters to company officials complaining about his pay and general problems in his department. The *Robins*

14

Court noted that a retaliatory discharge claim requires proof that "the discharge must violate a strong public policy as expressed in an 'unambiguous constitutional, statutory, or regulatory provision.'" *Id.* at 7 (quoting *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994)). Thus, the *Robins* Court concluded that the plaintiff could not state either a common law or statutory claim for retaliatory discharge because the plaintiff's letters did not mention any alleged illegal activities: "the only threat to go public concerns the pay dispute – hardly an illegal activity." *Id.* While Bowman attempts to distinguish *Robins* on the basis that the *Robins* plaintiff never alleged that the pay dispute was an illegality and Bowman used the terms "stealing" and "embezzling," the Court finds that these efforts are unavailing. Bowman's labeling of the dispute with PHP as an illegality does not make it so. The parties differed as to how Bowman's incentive compensation should be calculated and that is simply not an illegal activity.

PHP also relies on several cases from other jurisdictions which have held that no public policy prohibits an employer for terminating an employee for suing the employer nor for threatening to see a lawyer. *See e.g., Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1270-71 (N.D. Iowa 1995); *Deiters v. Home Depot U.S.A., Inc.*, 842 F. Supp. 1023, 1027-29 (M.D. Tenn. 1993); *Porterfield v. Mascari II, Inc.*, 823 A.2d 590, 607 (Md. Ct. App. 2003); *Abrams v. Echlin Corp.*, 528 N.E.2d 429 (Ill. Ct. App. 1988). Similarly, Bowman has cited no authority which holds that threatening to consult a lawyer constitutes refusal to remain silent about illegal activities and the Court has found none. Accordingly, the Court finds that

Bowman cannot show that he accused PHP of engaging in illegal activities or that he refused to remain silent about illegal activities.

With regard to the fourth element of a prima facie case, PHP argues that there is neither a "sole" nor a "substantial" causal relationship between Bowman's alleged refusal to remain silent about illegal activities and his termination.   PHP points out that Bowman relies on the proximity in time between his March 6 and 10, 2003 accusations to Greg Pierce that PHP was "embezzling" or "stealing" from him and the termination on March 11, 2003. PHP correctly notes that temporal proximity may constitute indirect evidence of retaliation under federal employment discrimination law, *see DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), but that the Tennessee Supreme Court has held that "proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship" for purposes of a retaliatory discharge claim.   *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997).  As further explained by *Austin v. Shelby County Government*, 3 S.W.3d 474, 480-81 (Tenn. Ct. App. 1999):

> Regardless of which constitutional, statutory, or regulatory policy an employer is alleged to have violated, in order to maintain an action for retaliatory discharge, a plaintiff must present evidence that his exercise of protected rights was causally related to his subsequent discharge.  A plaintiff may meet this requirement by presenting direct evidence of a causal link, such as where the employer was acting pursuant to an established policy or where the employer admitted the reason for the termination, or by presenting compelling circumstantial evidence.  The plaintiff cannot meet this burden, however, merely by showing that the plaintiff's participation in protected activity was followed by a discharge from employment, even where the proximity in time between the two events is very short.

16

*Id.* (internal citations omitted). Thus, the mere proximity in time between Bowman's complaints to Pierce and his termination, without more, is insufficient to establish the requisite causal relationship.

PHP points out that Hunsinger, not Pierce, made the decision to terminate Bowman. Bowman suggests that Pierce told Hunsinger of Bowman's allegations and that this factored into Hunsinger's decision. There is, however, no evidence in the record that Pierce relayed Bowman's complaints to Hunsinger. Bowman's speculation that Hunsinger was aware of his complaints is insufficient to create a causal relationship between his complaints to Pierce and his termination. *See also Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) ("[t]he plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship").

Bowman contends that he can establish a causal relationship by the temporal proximity as well as his evidence of pretext. As established by the Tennessee Supreme Court, proximity in time is insufficient to establish a causal relationship. Additionally, the Court does not reach the issue of prextext unless and until the plaintiff has satisfied the elements of a prima facie case. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 540 (6th Cir. 2002) (plaintiff's "failure to establish a prima facie case precludes us from reaching the questions of whether [the employer] had a legitimate, non-discriminatory reason for the reassignment and whether that reason was actually a pretext."). Therefore, because plaintiff cannot establish either the third or fourth elements of a prima facie case of common law or statutory retaliatory discharge, PHP will be granted summary judgment on these claims.

17

E.    Promissory Estoppel

Bowman asserts a claim for promissory estoppel on the basis that he reasonably relied upon PHP's promise to pay him commission to his detriment.  [Doc. 159 at ¶¶ 56-58.]  A claim for promissory estoppel is as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

*Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999) (quoting *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991); *see Shah*, 338 F.3d at 569.

PHP has also moved for summary judgment on Bowman's claim of promissory estoppel on the grounds that Bowman was compensated according to the terms of the ICPs and there is no other alleged promise of PHP upon which he reasonably relied.  Bowman argues that PHP made promises to pay in the ICPs which should be binding and injustice can be avoided only if those promises are enforced.

While there appears to be some uncertainty in the law as to when reliance is reasonable enough to support a promissory estoppel claim, the present record contains evidence that PHP made promises to pay Bowman according to the ICPs and PHP should have expected those promises to "induce action or forbearance of a definite and substantial character on the part" of Bowman.  *Shah*, 338 F.3d at 570.  As noted above, it is a question of fact whether Bowman was actually compensated according to the terms of those agreements or not.  Accordingly, the Court finds that there are disputes of material fact as to

18

defendant's promises and the plaintiff's action and response thereto and summary judgment will be denied on this claim.

F.    Conversion

PHP argues that Bowman's claim for conversion must be dismissed because a misinterpretation of the ICPs, if one occurred, is not an intentional act. PHP also argues that it was the true owner of the money claimed in this suit and therefore has not "appropriated" Bowman's money. Bowman argues that genuine issues of material fact remain as to who had the legal right to the commissions that he claims to have earned under the ICPs.

Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *Barger v. Webb,* 391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank,* 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988). Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Kinnard v. Shoney's, Inc.,* 100 F. Supp.2d 781, 797 (M.D. Tenn. 2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

Neither party addresses whether an employer's failure to pay compensation allegedly owed to an employee can constitute conversion. While the Court has found no analogous Tennessee cases, case law from other jurisdictions suggests that such facts do not state a claim for conversion. In *McCain v. P.A. Partners Ltd.*, 445 So.2d 271 (Ala. 1984), the

plaintiff asserted a claim for conversion for a payroll check withheld by her previous employer. The Alabama Supreme Court noted that the essence of a conversion action "is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, when the plaintiff has a general or special title to the property and possession or the immediate right of possession." *Id.* at 272. The *McClain* Court further noted that the plaintiff did not have an immediate right of possession in the payroll check at the time it was withheld. *Id.* The *McClain* Court also concluded that a negotiable instrument such as a paycheck remains the property of the drawer until there is a valid delivery and acceptance by the payee. *Id.* at 273; *see Oliver v. Hayes Int'l Corp.*, 456 So.2d 802, 805 (Ala. Civ. App. 1984). Other jurisdictions have reached similar conclusions. *See Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) ("An action of conversion does not lie to enforce a mere obligation to pay money."); *Temmen v. Kent-Brown Chevrolet Co.*, 605 P.2d 95, 99 (Kan. 1980) (no conversion action for withholding amounts from an employee's paycheck).

The Court concludes that Tennessee courts would reach a similar conclusion. Assuming that Bowman is owed more than he was compensated for his work for PHP, his remedy lies with a breach of contract claim and not a claim for conversion. PHP is entitled to judgment as a matter of law on this claim.

G.     Tenn. Code Ann. § 47-50-114

Plaintiff has asserted a claim under Tenn. Code Ann. § 47-50-114 which relates to the payment of commissions. The statute provides in pertinent parts as follows:

20

(b)(1) The terms of the contract between the principal and sales representative shall determine when a commission becomes due. ...

(b)(3) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within fourteen (14) days after the date of termination. Commissions that become due after the termination date shall be paid within fourteen (14) days after the date on which the commissions become due.

Tenn. Code Ann. § 47-50-114(b)(1) & (3). The statute defines "principal" as:

(2) "Principal" means a person who:

(A) Manufactures, produces, imports, or distributes a product for wholesale;

(B) Contracts with a sales representative to solicit orders for the product; and

(C) Compensates the sales representative, in whole or in part, by commission.

Tenn. Code Ann. § 47-50-114(a)(2).

PHP argues that it is not a "principal" that "manufactures, produces, imports, or distributes a product for wholesale." PHP contends that the statute is directed at a company engaged in a business that distributes a tangible product at wholesale to be resold at retail. Thus, PHP suggests the statute has no application here where it sells group health insurance plans. PHP relies on *Formestic, Inc. v. Residential Warranty Corp.*, 1997 WL 51490 (N.D. Ill. Feb. 4, 1997), where a similar Illinois statute was held not to apply to a defendant in the business of selling home warranties because the term "product" only encompassed tangible goods. Bowman argues that PHP's insurance plans are "products" such that PHP is a "principal" as defined by the statute.

21

The Court notes that there are no cases interpreting section 47-50-114 and that the term "product" is not defined by the statute.[4]  In the only arguably relevant authority the Court has found, *Forman v. National Council on Compensation Ins., Inc.*, 13 S.W.3d 365, 370 (Tenn. Ct. App. 1999), the Tennessee Court of Appeals held that the phrase "product or article" in the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, does not apply to workers' compensation insurance premiums, thus suggesting that a "product" cannot be an intangible item.  The Court has reviewed the *Formestic* decision  and finds it persuasive in reasoning that a "product" under section 47-50-114 does not include an intangible item such as an insurance plan.  Upon careful consideration, the Court agrees with PHP that it is not a "principal" as defined by Tenn. Code Ann. § 47-50-114 and therefore is entitled to summary judgment on this claim.

H.    Claims for Front Pay and Back Pay

PHP argues that Bowman should not be entitled to front pay because he would have been terminated in June 2004 (three months later than his actual termination) when PHP closed its Tri-Cities office.  Thus, PHP contends Bowman has no right to front pay because his employment would have ended before the trial.  PHP also argues that the date of Bowman's "inevitable" termination should cap any claim for back pay.  [Doc. 53.]

------

[4]Moreover, the Court notes that the term "product" is immediately preceded in the statute by the phrase "manufactures, produces, imports, or distributes," verbs which are not normally associated with and may be incompatible with intangible items such as health insurance plans.

Bowman points to testimony by Hunsinger, PHP's CEO, that some employees from the Tri-Cities office were offered positions in the Knoxville office and that Bowman "probably" would have been offered a sales position in Knoxville had he still been employed. Thus, Bowman suggests that there are questions of fact as to whether he would have been terminated in June 2004 when the Tri-Cities office closed.

Based on this evidence, the Court agrees with Bowman that it is a disputed question of fact as to whether his employment with PHP would have been terminated when PHP's Tri-Cities office closed. Thus, the Court will not, at this point, dismiss Bowman's claims for front pay or limit his claim for back pay. The Court does not, however, express any opinion at this time as to whether Bowman is entitled to such damages.

III.    **Conclusion**

For the reasons set forth herein, the defendant's motion for partial summary judgment on breach of contract, front pay, and back pay claims [Doc. 52] will be denied, and the defendant's motion for partial summary judgment as to plaintiff's statutory claims, retaliatory discharge claims, and claims for conversion and promissory estoppel [Doc. 58] will be granted in part and denied in part. An order reflecting this opinion will be entered.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE